UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:

Case No.  6:01-md-1404-19-DAB

PHILADELPHIA LIFE INSURANCE
COMPANY SALES PRACTICES
LITIGATION
_____

# ORDER

This case comes before the Court on the following:

1.  Plaintiffs' Motion for Class Certification (Doc. No. 24, filed Oct. 26, 2001); Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (Doc. No. 25, filed Oct. 26, 2001);

2.  Defendant's Response in Opposition to Plaintiffs' Motion for Class Certification (Doc. No. 59, filed Dec. 26, 2001); Defendant's Memorandum of Law in Support of Response in Opposition to Plaintiffs' Motion for Class Certification (Doc. No. 60, filed Dec. 26, 2001);

3.  Plaintiffs' Reply Memorandum in Support of Their Motion for Class Certification (Doc. No. 65, filed Jan. 11, 2002);

4.  Plaintiffs' Supplemental Memorandum in Support of Their Motion for Class Certification (Doc. No. 194, filed Feb. 18, 2005);

5.  Defendant's Supplemental Brief in Opposition to Plaintiffs' Motion for Class Certification (Doc. No. 199, filed Mar. 11, 2005);

6.  Plaintiffs' Supplemental Reply Brief in Support of Their Motion for Class Certification (Doc. No. 204, filed Mar. 18, 2005);

7.  Defendant's Sur-Reply in Opposition to Plaintiffs' Motion for Class Certification (Doc. No. 205, filed Mar. 25, 2005).

**Procedural Background**

Plaintiffs David Siegel and Gerald Jones initially filed separate class action lawsuits against Philadelphia Life Insurance Company, Mr. Siegel in U.S. District Court for the Middle District of Florida on August 25, 2000, and Mr. Jones in Texas state court on January 15, 2001. Among the claims raised by Plaintiffs were that Philadelphia Life was engaging in what are known as "level premium," "vanishing premium" and "churning" schemes.

On February 12, 2001, Conseco Life Insurance Companies (Conseco), the parent company of Philadelphia Life, removed the Jones case to the U.S. District Court for the Southern District of Texas on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332.  After removal, Conseco asked the Multi-District Litigation Panel to transfer the Jones case from the Southern District of Texas to the Middle District of Florida, pursuant to 28 U.S.C. § 1407.  This motion was granted, and the cases were consolidated into a nationwide class action.

On October 26, 2001, Plaintiffs filed their Consolidated Class Action Complaint in this Court.  (Doc. No. 23, filed Oct. 26, 2001).  Conseco later filed two separate motions for summary judgment on the claims of Siegel and Jones.  (Docs. No. 89–92, filed Feb. 22, 2002). The Court granted summary judgment in Conseco's favor as to all counts brought by Siegel arising out of his purchase of a level premium policy (Doc. No. 111, filed May 21, 2002), then entered an Order granting summary judgment as to all of Jones' vanishing premium-based claims.  (Doc. No. 112, filed June 12, 2002).  Both Plaintiffs appealed to the Eleventh Circuit Court of Appeals.  (Doc. No. 113, filed July 12, 2002).  The Eleventh Circuit affirmed this Court's summary judgment ruling as to Jones in its entirety.  (Doc. No. 118, filed Sept. 4, 2003). In addition, the Circuit Court upheld this Court's ruling as to Siegel's negligence claims as well

as his claims of fraud stemming from the alleged overcharge of expenses; however, the Court of Appeals reversed and remanded the case on Siegel's claims of fraudulent inducement and fraudulent concealment relating to the theories of churning and level premium repudiation. Subsequently, this Court denied Defendant's renewed summary judgment motion on Siegel's remaining claims.  (Doc. No. 121, filed Sept. 22, 2003; Doc. No. 139, filed Feb. 9, 2004).

Plaintiff Harold Arthur filed a class action complaint in the U.S. District Court for the Middle District of Florida on April 23, 2004, asserting claims of fraudulent inducement and fraudulent concealment based on Defendant's alleged vanishing premium scheme.  (Case No. 6:04-cv-587, Doc. No. 1).  On May 18, 2004, Arthur's case was consolidated with Siegel's action for all further proceedings.  (Doc. No. 152).

**Factual Allegations**

*Plaintiff Siegel*

In 1986, David Siegel purchased a $100,000 life insurance policy from Philadelphia Life Insurance Company, now known as Conseco (Defendant).  Siegel alleges he was told that the policy would be fully paid if he remitted $2,500 annually for five years.  (Doc. No. 60, Ex. C., Siegel Depo., pp. 22–23).  In June 1991, after Siegel's original policy was "paid up," Siegel received an unsolicited call from one of Defendant's independent agents, Cary Levinson.  Siegel alleges that Levinson told him he could increase his insurance from $100,000 to $150,000 and just pay a premium of $100 a year total until the age of 100.  (*Id.* at 44).

In his complaint, Siegel asserts that Levinson failed to mention the possibility that the interest credited might be insufficient to support the policy, nor did he mention the possibility that increased premium payments might be necessary at any time in the future.  (Doc. No. 23, ¶

22).  Siegel also alleges in his complaint that Levinson failed to explain any aspect of the replacement policy and failed to provide comparisons of the long range effect of the purchase of the new policy as compared to maintaining and adding to the older policy or purchasing a smaller supplemental policy.  (*Id.* at ¶ 23).  Furthermore, Siegel alleges he received no comparison of the costs and benefits of his original policy to the potential costs and benefits of the proposed replacement with the new policy.  (*Id.* at ¶ 24).

In deciding to purchase the second policy, Siegel asserts that he relied totally on Levinson's representations.  The two men had several phone conversations.  Siegel stated that although Levinson sent him some materials regarding the policy, he did not read them because he does not like to go through paperwork.  (Doc. No. 60, Ex. C, Siegel Depo., p. 50).  Siegel stated that he relied on Levinson's oral promises that the policy would only require an additional $100 premium for life to get the additional $50,000 in coverage because he trusted Levinson. (*Id.* at 50–51).

After surrendering his first policy, Siegel received his replacement policy in July 1991, and received an annual report every year thereafter.  However, Siegel admits he read only the third page of the policy and did not read any of the annual reports until 1993 or 1994.  (*Id.* at 71–72, 111–12).  The policy provided a twenty-day examination period during which it could be cancelled if it did not meet the insured's expectation.  (Doc. No. 60, Ex. G, p. 1).  Nowhere in the policy did it promise that the premium would always be $100 per year.

In his deposition, Siegel states that it was the 1994 Annual Report that raised a flag that he was allegedly being cheated.  (Doc. No. 60, Ex. C, Siegel Depo., pp. 112, 117).  It was in this report that Siegel noticed that the cost of the insurance per month was increasing as he aged and

as interest rates dropped, which indicated that annual payments of $100 might not be sufficient
to maintain the policy in the future.  (*Id.* at 123–26).

### Plaintiff Arthur

In 1994, Harold Arthur contacted Defendant's agent Carl Weaver and requested a
proposal for life insurance in the amount of $1.5 million.  (Doc. No. 186, filed Jan. 28, 2005, Ex.
A, Arthur Depo., p. 32–33).  Weaver informed Arthur that he was eligible to obtain a flexible
premium adjustable life policy.  (Case No. 6:04-cv-587, Doc. No. 1, ¶ 13).  According to the
allegations in the complaint, Weaver represented to Arthur that such a policy would require only
ten annual payments of $22,528.48 each, and that after ten payments, the policy would be "paid
up" and would not require additional premiums.  (*Id.* at ¶ 14).  Weaver also gave Arthur the
option of paying $10,000 extra with the first annual payment and reducing the number of
required annual payments from ten to nine, which option Arthur elected.  (*Id.* at ¶¶ 14, 15).
Arthur purchased and received his policy in May 1994.  (*Id.* at ¶ 15).

Arthur testified that the information he learned about the policy came from written
materials provided by Weaver as well as Weaver's oral representations.  (Doc. No. 186, Ex. A,
Arthur Depo., p. 41).  Arthur and Weaver met in person two or three times and had a number of
telephone conversations regarding the policy.  (*Id.* at 43).  Weaver allegedly represented that the
proposal of annual premium payments of $22,528.48 for ten years was based on a fixed rate, and
upon Arthur's request, Weaver made a handwritten notation on the proposal indicating,
according to Arthur's interpretation, that those terms were guaranteed.  Arthur testified that he
would not have purchased the policy without Weaver's oral and handwritten confirmation of this
guarantee.  (*Id.* at 45–46, 84–85).

Arthur read his policy when he received it and testified that he understood it to indicate that he would "build up equity within the policy to carry the policy." (*Id.* at 47). In 2002, Arthur alleges that he was notified by Defendant that its investments had lost money and that he would be required to make additional premium payments in order to maintain his policy. (*Id.* at 51; Case No. 6:04-cv-587, Doc. No. 1, ¶ 16).

**Defendant's Agents and Products**[1]

Between 1980 and 1999, Defendant marketed and sold flexible premium adjustable life insurance policies in forty-nine states (all states except New York) through 29,601 independent contractors and brokers who were licensed to sell Defendant's products as well as those of other insurance companies. (Doc. No. 199, Ex. A, Scuglik Aff., ¶¶ 3–5). According to Defendant's Assistant Vice President Frank Scuglik, these independent agents did not participate in a uniform training program with regard to Defendant's products but were trained by other independent agents and brokers through a number of Independent Marketing Organizations (IMOs) which were not under Defendant's control. (*Id.* at ¶¶ 6–7). As laws, regulations and economic conditions changed and new products came onto the market during this period, the training received by independent agents changed as well. *Id.* at ¶ 8.

During the proposed class period, Defendant did not provide agents and brokers with uniform sales scripts or standardized illustrations, and the agents orchestrated their own presentations independent of Defendant. (*Id.* at ¶ 9; Doc. No. 60, Ex. A, White Aff., ¶ 4). Defendant did provide agents with computer software which created individualized illustrations for presentation to potential purchasers by allowing the agents to adjust several variables such as

---

[1] These facts asserted by Defendant are undisputed in the record.

a specified death benefit, a specified term, declining face value or increasing cash value, and the

projected interest rate.  (Doc. No. 60, Ex. B, Baily Aff., ¶¶ 4–5).  These variables were changed

in the illustrations for each individual customer.  (*Id.* at ¶ 6).

Scuglik avers that Defendant sold approximately 126,500 policies during the proposed

class period, all of which varied depending on the state of issuance, and some of which contained

choice-of-law provisions.  (Doc. No. 199, Ex. A, Scuglik Aff., ¶¶ 12, 17).  Among the 126,500

policies sold, Defendant sold the following:

- Approximately 80,000 universal life insurance policies with twenty-two variations, plus distinct versions depending on state-specific requirements (*Id.* at ¶ 13);

- Approximately 33,000 traditional whole life policies with ten variations and 10,300 interest sensitive whole life policies with five variations, plus state-specific versions (*Id.* at ¶¶ 14–15);

- Approximately 2,100 term life policies (*Id.* at ¶16).

Additionally, the language and format of disclosures contained in these policies regarding

interest rate variability and its effect on future premiums changed over the course of the class

period.  (*Id.* at ¶ 19).

## Analysis

Plaintiffs seek certification of the following class, consisting of two subclasses:

All persons and/or entities who reside in the United States and who between 1982 through December 31, 1999, have (or had at the time of policy termination) an ownership interest in a whole life or universal life insurance policies issued by Philadelphia Life, and

1.    the policy was funded in whole or in part from funds obtained from a previously issued life insurance policy [the replacement or "churning" subclass]; or

2.    the amount or duration of premium represented by Philadelphia Life to be sufficient to maintain the policy in force throughout the lifetime of the insured or

until the maturity date of the policy was insufficient to so maintain the policy [the "vanishing premium" and "level premium" subclass].  (Doc. No. 194, p. 1).

Before certifying a class, the Court must be satisfied that several prerequisites are met: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  In addition, the proposed class must meet the requirements of one of three class types outlined in Rule 23(b).  In the instant case, the parties seek certification under Rule 23(b)(3),[2] which requires the Court to find "that the questions of law or fact common to the members of the class predominate" over individual issues of law or fact, and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Although the Court should not pass judgment on the merits of Plaintiffs' claims in deciding the issue of class certification, it must conduct a "rigorous analysis" to determine whether the prerequisites of Rule 23(a) and (b) have been met, and "it may be necessary...to probe behind the pleadings before coming to rest on the certification question."  *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 161 (1982).

---

[2]  Although the Arthur complaint requests certification of the class pursuant to Rule 23(b)(2) *or* 23(b)(3) (Case No. 6:04-cv-587, Doc. No. 1), Plaintiffs' supplemental memoranda in support of class certification address only the predominance and superiority requirements of Rule 23(b)(3).  (Doc. No. 194, 204).  The Court notes that certification under Rule 23(b)(2) is reserved for those cases in which the relief sought is primarily injunctive or declaratory in nature.  *See Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142 (3d Cir. 1998).  In the instant case, Plaintiffs primarily seek compensatory and punitive damages, while the equitable relief sought appears to be of secondary importance.  Thus, certification under Rule 23(b)(2) likely would be inappropriate.  *See, e.g.*, *id.*; *In re Jackson Nat'l Life Ins. Co. Premium Litig.* ["*Jackson Nat'l I*"], 183 F.R.D. 217, 220 (W.D. Mich. 1998).

As an initial matter, Defendant takes issue with the definition of the proposed class, arguing that it is too broad and does not sufficiently identify class members.  "[W]hen the [alleged] conduct consists of a series of discrete acts that vary in nature and are committed over a protracted period of time, "the class is likely not ascertainable."  *Van West v. Midland Nat'l Life Ins. Co.*, 199 F.R.D. 448, 451 (D.R.I. 2001).  In the instant case, the proposed class would encompass all individuals who purchased vanishing premium or level premium policies over a seventeen year period, including those who may not have been misled by their individual sales agents or brokers. In addition, Defendant states that it does not maintain records of those policies purchased with the proceeds from older policies (i.e. replacement policies), and therefore it would be impossible to readily identify all members of the "churning" subclass.[3]  (Doc. No. 199, Ex. A, Scuglik Aff., ¶ 22).  Thus, the ascertainability of the proposed class is in doubt.  *See id.* Because the Court finds that class certification is inappropriate because Plaintiffs have failed to satisfy the predominance and superiority requirements of Rule 23(b)(3, discussed *infra*, it does not make an express determination on the issue of ascertainability.

Likewise, in light of the Court's findings under Rule 23(b)(3), the Court will forego an in-depth analysis as to whether the purported class satisfies the numerosity,[4] commonality,[5]

---

[3]  Plaintiffs' accusation that Defendant has effectively admitted to the destruction of evidence by asserting that it does not maintain records of terminated policies for more than seven years (Doc. No. 199, Ex. A, Scuglik Aff., ¶ 12; Doc. No. 204, p. 5) appears to be unfounded.

[4]  Generally, more than forty (40) putative class members is sufficient to make joinder of all members impracticable.  *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986).

[5]  To meet the commonality requirement, the Court must find only that "at least one issue exists that affects all or a significant number of proposed class members."  *Elkins v. Equitable Life Ins. Co. of Iowa*, 1998 WL 133741, *11 (M.D. Fla. 1998) (citation omitted).

typicality,[6] and adequacy of representation[7] elements of Rule 23(a) and will assume *arguendo*

that each of these threshold requirements has been met.

### Rule 23(b)(3):  Predominance

The predominance requirement of Rule 23(b)(3) is "far more demanding" than the

commonality question in Rule 23(a)(2) in order to ensure that "proposed classes are sufficiently

cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S.

591, 623, 624 (1997).

*Common Issues of Law Do Not Predominate*

It is undisputed that if certification is granted, the Court will be required to apply the laws

of forty-nine states in which Defendant sold life insurance policies during the class period.

While it is true, as Plaintiffs suggest, that the application of the laws of various jurisdictions will

not automatically defeat a finding of predominance, Plaintiffs bear "the burden of showing

uniformity or the existence of only a small number of applicable standards (that is,

"groupability") among the laws of the [forty-nine] states."  *Klay v. Humana, Inc.*, 382 F.3d 1241,

1262 (11th Cir. 2004) (quoting *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986)

("movants must credibly demonstrate, through an extensive analysis of state law variances, that

---

[6]  Rule 23(a)(c) requires that "the claims of the class representatives arise from the same broad course of conduct that gives rise to the claims of the other class members...."  *Elkins*, 1998 WL 133741, *13.  Typicality is not defeated by slight factual differences between the representatives and the rest of the class.  *Id.*

[7]  Rule 23(a)(d) demands that the interests and legal rights of absent class members be protected by ensuring adequate representation on the part of both the class representatives and their counsel.  *Elkins*, 1998 WL 133741, *14.  First, the representatives "must appear to be capable of prosecuting the actions through qualified, experienced and competent counsel."  *Id.* Secondly, the Court must find that there is "no antagonism or disabling conflict between the interests of the named class representatives and the interests of the members of the class."  *Id.*

class certification does not present insuperable obstacles.").  In *Klay*, the appellate court accepted plaintiffs' proposition that the only legal issue in their breach of contract claims was the definition of "breach," which did not differ among the states; nevertheless, the court vacated certification of the class on those claims due to individualized factual issues.[8]

In a district court case[9] where the plaintiffs seeking class certification had "offered only broad definitions, outlines, and generalized statements about the claims they pled" under the laws of five states rather than an extensive analysis, a magistrate judge found that the plaintiffs had failed to meet their burden of establishing substantial similarity among the various states' laws.  *Jim Moore Ins. Agency v. State Farm Mut. Auto. Ins. Co.*, 2003 WL 21146714, *10, 11 (S.D. Fla. 2003), *report and recommendation adopted at* 2003 WL 22097937 (S.D. Fla. 2003).

In *Adams v. Kansas City Life Ins. Co.*, the plaintiff not only submitted tables demonstrating the similarity of elements of her tort claims among the states but she also provided the district court with sample jury instructions reflecting any variations.  192 F.R.D. 274, 278 (W.D. Mo. 2000).  The court joined in the defendant's concern that the plaintiff's submissions overlooked "numerous potentially divergent state law issues subsumed in the analyses of whether the various elements of plaintiff's tort claims [could] be satisfied or whether [the defendant could] assert certain defenses to plaintiff's claims."  *Id.*  Although the plaintiff asserted that such variations could "be easily handled by grouping" them, the court could not "rely on assurances of counsel that any problems with predominance or superiority [could] be

---

[8]  See detailed discussion of *Klay*, *infra*.

[9]  In conducting its own research, the Court was unable to identify cases which have examined and identified specifically what constitutes a credible extensive analysis above the district court level.

overcome," and held that the plaintiff had failed to satisfy her burden.  *Id.* (quoting *Costano v. Am. Tobacco Co.*, 84 F.3d 734, 742 (5th Cir. 1996)).

In the instant case, Plaintiffs have submitted a chart purporting to set forth all possible variations in the elements of fraud claims as required by the laws of the forty-nine states at issue. (Doc. No. 65, Ex. G).  The table does little more than provide a laundry list of case citations, and it underscores the distinctions among states which require, for example, actual justifiable reliance on a material misrepresentation and those requiring any reliance, whether or not justifiable, on any representation, whether or not material.  However, there are a variety of possible combinations within these distinctions, and Plaintiffs make no effort to group states with substantially similar laws into a smaller, more manageable number of groups.

Furthermore, Plaintiffs have not gone beyond the basic elements of fraud claims to examine those questions of law concerning statutes of limitations and, of particular importance in this action, circumstances under which such limitations may be equitably tolled.  It is clear from the proceedings in this case to date that such variations have an impact on the viability of each putative class member's claim.  Because Florida law employs the "delayed discovery doctrine" in tolling the limitations period in fraud actions until the plaintiff "knew or should have known" of the existence of a claim, Siegel's claims were permitted to go forward.  (Doc. No. 118, p. 9, 11–12).  On the other hand, Texas law tolls the statute of limitations only where the injury is "inherently undiscoverable," and imposes on an insured the duty to read his policy and charges him with knowledge of its terms and conditions.  (*Id.* at 21–22).  Thus Jones' claims were held to be time barred.  (*Id.* at 24).

Plaintiffs further argue that, pursuant to the Eleventh Circuit's approval of this Court's choice-of-law analysis as to Siegel and Jones, the law of the case is established that the law of the state of the insured's residence shall apply to each putative class member's claim. Plaintiffs' assertion is an oversimplification of this Court's analysis and of the appellate court's opinion. Although the facts concerning Siegel and Jones appear to establish such a pattern, and the results of the "most significant relationship" test as applied to many class members' claims are likely to follow suit, the necessity of conducting the choice-of-law inquiry for each policyholder remains. "[T]he choice-of-law analysis is a matter of due process and is not to be altered in a nationwide class action simply because it may otherwise result in procedural or management difficulties." *Jackson Nat'l I*, 183 F.R.D. at 223 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821–22 (1985)).

Some portion of the policies issued during the proposed class period contained choice-of-law provisions which could have an effect on the analysis while others did not. Moreover, as Defendant points out, we live in a transient society; therefore, the location in which the alleged fraud was committed may differ from the insured's current state of residence. Determining which of forty-nine states' laws must govern the individual claims of each class member is another question of law and fact which adds yet another level of complication and militates against certification.

*Common Issues of Fact Do Not Predominate*

In *Amchem*, an asbestos products liability action, the Supreme Court held that the predominance requirement was not met where individual class members had been exposed to various products containing asbestos for widely differing amounts of time and in different ways,

and where some class members had already experienced debilitating physical injury while others exhibited only early symptoms and still others had not yet developed any signs of injury.  521 U.S. at 624.  Considering a proposed settlement class which obviated the "need [to] inquire whether the case, if tried, would present intractable management problems," the Court nevertheless held that the requirements of Rule 23(b)(3) were not satisfied and certification was inappropriate due to the overarching factual differences among the putative class members.  *Id.* at 620.  At least one court has expressly applied *Amchem* and its mass tort principles in the insurance and annuities context.  *See In re LifeUSA Holding, Inc.*, 242 F.3d 136, 145–48 (3d Cir. 2001) (relying on *Amchem* in annuities case, vacating class certification on predominance and superiority grounds where pre-sale marketing and sales were not scripted or uniform and were made by tens of thousands of independent agents to hundreds of thousands of customers, each sale constituting a separate transaction rather than a common course of conduct).

The Advisory Committee Notes concerning the requirements of Rule 23(b)(3) set the tone for an analysis of factual predominance in a fraud-based class action such as the one proposed in the instant case:

> [A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.  On the other hand, although having some common core, a fraud case *may be unsuited for treatment as a class action if there was a material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed*.

Fed. R. Civ. P. 23 advisory committee's note (1966).

Several courts have addressed the issue of class certification in cases involving vanishing premium- and churning-based claims.  Almost universally, those courts have ruled that disparate

questions of fact and law predominated and would make prosecution of a class action

unmanageable. *See, e.g.*, *Markarian v. Conn. Mut. Life Ins. Co.*, 202 F.R.D. 60 (D. Conn. 2001)

(rejecting Massachusetts-only class asserting non-jury claims arising from sale of vanishing

premium policies where class members relied on oral representations made by independent

agents as well as alleged material omissions from sales illustrations, where training of agents

was not uniform and no common sales scripts were employed, and where information provided

to agents by defendant changed over the years of the proposed class period); *Van West*, 199

F.R.D. at 453–54 (predominance and superiority not met even where uniform promotional

literature contained alleged misrepresentations because plaintiffs also alleged individual

misrepresentations by agents and brokers with varying employment relationships to defendant);

*Kent v. SunAmerica Life Ins. Co.*, 190 F.R.D. 271, 279–80 (D. Mass. 2000) (denying vanishing

premium class certification where computerized illustrations were customized by individual

agents for specific customers, where not all plaintiffs received such illustrations and some

received them only after having purchased their policies, and where face-to-face oral

representations differed, stating that predominance was "hard to find in such a grab-bag of

individualized factual findings"); *In re Jackson Nat'l Life Ins. Co. Premium Litig.* ["*Jackson

Nat'l II*"], 193 F.R.D. 505, 510–11 (W.D. Mich. 2000) (denying certification of narrow Texas-

only vanishing premium class where sales presentations were not uniform, holding that duty to

disclose was to be determined on case-by-case basis such that alleged omission of material

information did not permit presumption of reliance and varying oral representations created case-

specific fact issues which defeated predominance); *Keyes v. Guardian Life Ins. Co. of Am.*, 194

F.R.D. 253, 256–61 (S.D. Miss. 2000) (certification of vanishing premium class inappropriate

where defendant sold products through independent general agents not trained by defendant and where each class member's "success or failure [would] depend on a substantially more individualized inquiry as to the mix of information received...and how the information affected the class member's decision," rejecting plaintiffs' argument that reliance could be presumed and holding that common questions were overshadowed by individual issues); *Cohn v. Mass. Life Ins. Co.*, 189 F.R.D. 209, 212–18 (D. Conn. 1999) (even in light of defendant's training video discouraging agents from disclosing possible decline in dividend rates on vanishing premium policies, individual questions predominated where policy disclosures changed several times during class period, agents were not uniformly trained and were not under control of defendant, sales presentations differed depending in part on questions asked by customer, and reliance could not be presumed due to "the inevitable differences in the knowledge and financial sophistication of the members of the proposed class and the degree of care they exercised in reviewing the documentation presented to them"); *Parkhill v. Minn. Mut. Life Ins. Co.*, 188 F.R.D. 332, 342–43 (D. Minn. 1999) (denying certification of class where differences in sales presentations and materials used in hundreds of thousands of individual meetings would necessitate "thousands of inquiries into the content of each sales presentation, the expectations and questions asked by each policyholder, and the reliance placed by the policyholder on the representations made by defendant's agents"); *In Re The Hartford Sales Practices Litig.*, 192 F.R.D. 592, 605–07 (D. Minn. 1999) (in vanishing premium and churning case, rejecting class-wide presumption of reliance where oral representations were made and finding that "it would be virtually impossible—and certainly impracticable—to resolve on a class-wide basis questions of individual reliance on the part of class members"); *Velasquez v. Crown Life Ins. Co.*, 1999 WL

33305652, *3, 5 (S.D. Tex. 1999) (even assuming that illustrations and marketing materials were uniform, plaintiff's causes of action implicated "individualized questions of misrepresentation, scienter, reliance, and causation that predominate over common questions" due to non-standardized sales pitches accompanying illustrations); *Jackson Nat'l I*, 183 F.R.D. 217, 221–23 (W.D. Mich. 1998) (denying certification of nationwide vanishing premium class on grounds that reliance was a fundamental factual issue and could not be presumed in light of differing oral representations by agents and that variations in laws of forty-nine states "represent[ed] legitimate and unavoidable considerations which substantially compound[ed] the proliferation of disparate factual and legal issues"); *Rothwell v. Chubb Life Ins. Co. of Am.*, 191 F.R.D. 25, 31–33 (D.N.H. 1998) (in case involving vanishing premium and churning subclasses, both types of claims would require "mini-trials" to determine the representations made by an agent and the reliance placed on such representations as to each individual class member making class certification inappropriate).

In contrast, those cases in which class certification of vanishing premium- or churning-based claims were approved are easily distinguishable from the facts of the instant case.  *See, e.g.*, *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 314, 316 n.57 (3d Cir. 1998) (affirming certification of settlement class, where questions of manageability at trial were obviated, finding common issues of fact predominated where focus was on conduct of defendant's management, where sales agents were trained uniformly by defendant, where sales presentations and materials were uniform, and where reliance was not an element of most of the plaintiffs' claims); *In re Great Southern Life Ins. Co. Sales Practices Litig.*, 192 F.R.D. 212, 219–20 (N.D. Tex. 2000) (permitting presumption of reliance and granting certification of

vanishing premium class where law of Texas applied to all claims and where material

misrepresentation by omission was alleged to be committed by defendant in information

provided to its agents, not at the point of sale between agents and policyholders); *In re New*

*England Mut. Life Ins. Co. Sales Practices Litig.*, 183 F.R.D. 33, 43 (D. Mass. 1998) (certifying

class based on Rule 23(b)(1) and accordingly not conducting predominance analysis under

23(b)(3)); *Cope v. Metro. Life Ins. Co.*, 696 N.E.2d 1001, (Ohio 1998) (in churning case,

permitting reliance presumption and certifying class where defendant was alleged to have

intentionally omitted state-mandated written disclosure warnings and where claims were not

based on oral representations).

      In response to Defendant's reliance on many of the vanishing premium and churning

cases cited above in which class certification was held to be inappropriate, Plaintiffs argue that

such cases are not binding and urge the Court to follow two Eleventh Circuit opinions which

Plaintiffs insist are based on factually similar circumstances and require certification in the

instant case.  Upon review of the cases cited extensively by Plaintiffs, however, the Court finds

that they are dissimilar and unavailing.

      In *Klay v. Humana, Inc.*, a group of physician plaintiffs sued several national health

maintenance organizations (HMOs), alleging that they had conspired for decades to underpay

doctors for services provided to the defendant HMOs' insureds.  382 F.3d at 1248–49.  The

plaintiffs asserted conspiracy claims under the federal RICO Act as well as various state law

claims.  *Id.* at 1250.  In affirming class certification on the plaintiffs' *federal claims*, the Court

reasoned that questions of fact regarding the defendants' alleged national conspiracy were

common to all plaintiffs.  *Id.* at 1256.  Although the Court permitted a presumption of reliance

for purposes of the RICO claims, it did so because all communications between the defendant HMOs and the plaintiff doctors had conveyed the same general message "that the defendants would honestly pay physicians the amount to which they were entitled." *Id.* at 1258.

In their vigorous reliance on the *Klay* opinion, Plaintiffs appear to overlook that while the Eleventh Circuit approved certification on the federal claims, it held that the district court abused its discretion in certifying the state-based claims, largely because factors such as the variations among the laws of all states, the lack of uniformity among the plaintiffs' contracts, and the defendants' employment of various specific means in breaching those contracts required individualized findings of fact as to each putative class member which predominated over any common questions. *Id.* at 1261–67.

Plaintiff also relies on the Eleventh Circuit's affirmance of class certification in *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003). In that case, the plaintiffs were Exxon dealers in thirty-five states who alleged that the defendant overcharged them for fuel purchases in violation of their dealer agreements. *Id.* at 1252. In affirming the district court's certification of the class, the appellate court noted that all of the dealer contracts at issue were materially similar, that the defendant owed a duty of good faith to the dealers as a whole, and that whether defendants' uniform, systematic conduct constituted a breach was a common question. *Id.* at 1261. Turning to the district court's opinion, on which Plaintiff relies for the assertion that reliance can and should be presumed where fraudulent concealment is an issue, the alleged affirmative misrepresentations upon which reliance was presumed in that case were made repeatedly to dealer representatives at national conventions where defendant continuously assured the dealers that it was fulfilling its obligations under their agreements.

*Allapattah Servs., Inc. v. Exxon Corp.*, 188 F.R.D. 667, 677 (S.D. Fla. 1999). Thus, *Klay* and

*Allapattah* are distinguishable from the instant case. In the case at bar, oral misrepresentations

allegedly were made in thousands of face-to-face meetings by independent agents to individual

class members concerning policies which varied by type, by state, and by date of issuance.

Furthermore, the Court is unpersuaded by Plaintiffs' argument that in its denial of

Defendant's renewed motion for summary judgment as to Siegel, it has already ruled that

Defendant owed a duty of full disclosure to Siegel by purporting to disclose all material facts and

that Defendant failed to fulfill that duty. (Doc. No. 204, p. 6–7). Plaintiffs contend that the issue

of Defendant's duty to disclose is an issue common to the class with regard to their fraudulent

concealment claims. (*Id.*). This argument is misguided. The Court notes that it did not make a

factual finding that Defendant had breached its duty to disclose information to Siegel; it merely

held that Siegel had presented sufficient evidence to survive summary judgment and present his

claim to a jury. (Doc. No. 139, p. 12). Moreover, to the extent that the Court held as a matter of

law that Defendant had a duty to disclose all material information to Siegel, it did so based on

Cary Levinson's cold call offering Siegel a "great deal" on a new policy. (*Id.* at 10).

On the other hand, whether Defendant assumed the same duty to disclose all material

information to Arthur that it owed to Siegel has not been determined. In fact, Arthur testified

that he called Carl Weaver on his own initiative because he wanted to purchase life insurance

and that he shopped around, receiving proposals from other agents before settling on

Defendant's policy. (Doc. No. 186, Arthur Depo., p. 32–33). These individual circumstances

surrounding how the two putative class representatives came to purchase life insurance policies

from Defendant underscore once again how factual differences affect the elements of class

members' claims and the defenses raised by Defendant.  Rather than lending support for

Plaintiffs' assertion that a class-wide duty to disclose and reliance on a failure to disclose can be

presumed, the Court's summary judgment Order is contrary to such a proposition.

In further support of their position that class members' reliance should be presumed,

Plaintiffs argue that their fraudulent concealment claims are based on the omission of material

information from Defendant's standard form insurance policies and that this failure to disclose

trumps any variations in oral representations made to purchasers by individual agents.  (Doc. No.

194, p. 8).  However, the *Adams* court rejected a similar argument based on the alleged failure of

the defendant to disclose material information in its uniform policy application.  192 F.R.D. at

278–79.  The court stated, "common sense dictates that, before the parties would fill out an

application, the customer must be convinced to purchase a particular policy.  Therefore, any

detrimental reliance would occur during the agent's sales presentation" which in that case, like

the case at bar, varied due to the lack of uniform training, sales scripts, or marketing materials.

The Court finds that a presumption that the reliance element of plaintiffs' claims of fraud has

been satisfied by all putative class members would be inappropriate in this case.

The facts of the instant case are essentially identical to those in which other courts have

declined to certify class actions on vanishing-premium-based claims.  Defendant's sales force

consisted of independent agents and brokers who did not receive uniform training; there were no

sales scripts or uniform sales pitches; computerized illustrations were capable of variation and

manipulation by agents to reflect the specific needs of individual customers; and use of written

materials was left to the agent's discretion.  The materials produced by Defendant changed

throughout the course of the class period, and it appears that any reliance on alleged omissions of

material fact was combined with reliance on alleged affirmative non-uniform oral representations

by agents.  Additionally, the purported class implicates variations in the laws of forty-nine states,

including the basic elements of fraud as well as statutes of limitations and equitable tolling.

Accordingly, the Court finds that individual questions of law and fact predominate over common

questions that exist and that class certification would be inappropriate in this case.

### Rule 23(b)(3): Superiority

In addition to the predominance requirement, Rule 23(b)(3) provides several factors to be

considered by the Court in determining whether "a class action is superior to other available

methods for the fair and efficient adjudication of the controversy:"

> (A) the interest of members of the class in individually controlling the prosecution
> or defense of separate actions; (B) the extent and nature of any litigation
> concerning the controversy already commenced by or against members of the
> class; (C) the desirability or undesirability of concentrating the litigation of the
> claims in the particular forum; (D) the difficulties likely to be encountered in the
> management of a class action.

Fed. R. Civ. P. 23(b)(3).  It is the forth factor which strongly militates against class certification

in the instant case.

"'Manageability'...encompasses the whole range of practical problems that may render

the class action format inappropriate for a particular suit."  *Jim Moore*, 2003 WL 21146714 at

*13 (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974) (alterations in original).

As discussed *supra*, the overwhelming factual and legal differences implicated by the

individual putative class members' claims make a class action in this case not simply daunting;

they make such an action unmanageable.  Where, as here, the claims are to be tried before a jury,

the task of making thousands of factual determinations and evaluating them under the variations

of the laws of forty-nine states would be virtually impossible.  As stated in *Jim Moore*, Plaintiffs

"have not explained how varying state laws and thousands of factual issues 'could be presented to a jury for resolution in a way that fairly represents the law of the [various] states while not overwhelming jurors with [thousands] of interrogatories and a verdict form as large as an almanac.'" *Id.* at *14 (quoting *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 350 (D.N.J. 1997) (alterations in original); *see also Jackson Nat'l I*, 183 F.R.D. at 223 ("Although [plaintiffs] have provided copies of jury instructions and verdict forms proposed for use in several other class actions, they have failed to show that the disparate legal and factual issues posed by this case are manageable in trial.").

Plaintiffs indicate that if class certification is denied, putative class members will be unable to effectively vindicate their rights due to the modesty of their claims, their limited resources, and the impediments of the litigation process.  (Doc. No. 204, p. 2).  The Court is unpersuaded.  Even where the "modest" claims of individual plaintiffs may make separate lawsuits impracticable, however, "that factor by itself is insufficient to overcome the hurdles of predominance and superiority and efficient and fair management of a trial...."  *LifeUSA*, 242 F.3d at 148 n.13 (citation omitted).  The Court finds that under Rule 23(b)(3),  the class action format is not the superior method for litigating the claims of the putative class members in this case.

***Onderdonk Settlement***

Finally, Plaintiffs argue that Defendant is estopped from contesting class certification in this case in light of its assent to certification of a settlement class in another case allegedly involving similar facts.  (Doc. No. 194, Ex. A, *Onderdonk* Settlement Notice; Doc. No. 204).  In support of their contention, Plaintiffs cite the Seventh Circuit's opinion in *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004).  In that case, a defendant had previously

advocated class certification for purposes of a global settlement, but when the original settlement was rejected, the defendant opposed a renewed certification of essentially the same class *in the same action*. *Id.* at 659. The appellate court ruled that such objection was judicially estopped for settlement purposes but that the defendant could contest the propriety of certification for litigation purposes based on manageability issues. *Id.* at 660.

In addition to the obvious distinction that the proposed class in the instant case implicates serious issues of manageability at trial while the *Onderdonk* class was certified for a settlement,[10] the *Onderdonk* class was approved in an entirely separate lawsuit from the one at bar and is immaterial to the issue of estoppel, however similar the allegations in the two cases may be. Defendant is not estopped by virtue of the *Onderdonk* case from contesting Plaintiff's motion for class certification.

### Conclusion

Based on the foregoing, Plaintiffs' Motion for Class Certification (Doc. No. 24) as modified by their Supplemental Memorandum in Support of the motion (Doc. No. 194) is **DENIED**.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[10] Plaintiffs acknowledge this distinction.

**DONE** and **ORDERED** in Chambers in Orlando, Florida this _9th__ day of May, 2005.

Copies furnished to:

Counsel of Record