UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:

Case No. 6:01-md-1404-19-DAB

**PHILADELPHIA LIFE INSURANCE COMPANY SALES PRACTICES LITIGATION**

_____

**HAROLD R. ARTHUR, individually and as Trustee of the Harold R. Arthur Revocable Living Trust,**

            Plaintiff,

-vs-                                               Case No. 6:04-cv-587-19-JGG

**CONSECO LIFE INSURANCE COMPANY,**

            Defendant.

_____

# ORDER

This case comes before the Court on the following:

1. Defendant's Motion for Summary Judgment Against Plaintiff Harold Arthur (Doc. No. 176, filed Jan. 14, 2005); Defendant's Memorandum in Support of its Motion for Summary Judgment (Doc. No. 177, filed Jan. 14, 2005);

2. Plaintiff Harold Arthur's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 186, filed Jan. 28, 2005).

**Procedural Background**

Plaintiffs David Siegel and Gerald Jones initially filed separate class action lawsuits against Philadelphia Life Insurance Company, Mr. Siegel in U.S. District Court for the Middle District of Florida on August 25, 2000, and Mr. Jones in Texas state court on January 15, 2001.

Among the claims raised by Plaintiffs were that Philadelphia Life was engaging in what are known as "level premium," "vanishing premium" and "churning" schemes.

On February 12, 2001, Conseco Life Insurance Companies (Conseco), the parent company of Philadelphia Life, removed the Jones case to the U.S. District Court for the Southern District of Texas on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332. After removal, Conseco asked the Multi-District Litigation Panel to transfer the Jones case from the Southern District of Texas to the Middle District of Florida pursuant to 28 U.S.C. § 1407. This motion was granted, and the cases were consolidated into a nationwide class action.

On October 26, 2001, Plaintiffs filed their Consolidated Class Action Complaint in this Court. (Doc. No. 23, filed Oct. 26, 2001). Conseco later filed two separate motions for summary judgment on the claims of Siegel and Jones. (Docs. No. 89–92, filed Feb. 22, 2002). The Court granted summary judgment in Conseco's favor as to all counts brought by Siegel arising out of his purchase of a level premium policy on timeliness and ripeness grounds (Doc. No. 111, filed May 21, 2002), then entered an Order granting summary judgment as to all of Jones' vanishing premium-based claims. (Doc. No. 112, filed June 12, 2002). Both Plaintiffs appealed to the Eleventh Circuit Court of Appeals. (Doc. No. 113, filed July 12, 2002). The Eleventh Circuit affirmed this Court's summary judgment ruling as to Jones in its entirety.[1] (Doc. No. 118, filed Sept. 4, 2003). In addition, the Circuit Court upheld this Court's ruling as to Siegel's negligence claims as well as his claims of fraud stemming from the alleged overcharge of expenses; however, the Court of Appeals reversed and remanded the case on

---

[1] This Court entered final judgment in favor of Defendant and against Plaintiff Jones on January 28, 2005. (Doc. No. 185).

Siegel's claims of fraudulent inducement and fraudulent concealment relating to the theories of churning and level premium repudiation. Subsequently, this Court denied Defendant's renewed summary judgment motion based on the substantive merits of Siegel's remaining claims. (Doc. No. 121, filed Sept. 22, 2003; Doc. No. 139, filed Feb. 9, 2004).

Plaintiff Harold Arthur filed a class action complaint in the U.S. District Court for the Middle District of Florida on April 23, 2004, asserting claims of fraudulent inducement and fraudulent concealment based on Defendant's alleged vanishing premium scheme. (Case No. 6:04-cv-587, Doc. No. 1). On May 18, 2004, Arthur's case was consolidated with Siegel's action for all further proceedings. (Doc. No. 152). Siegel and Arthur renewed an earlier request for certification of a nationwide class by submitting to the Court a supplemental memorandum of law in support of certification (Doc. No. 194, filed Feb. 18, 2005), which the Court denied on May 9, 2005. (Doc. No. 209). The Court now considers Defendant's motion for summary judgment as to the individual claims of Arthur. (Doc. No. 186).

**Factual Allegations**

Harold Arthur holds a Bachelor of Science degree from Rollins College with a major in economics and received a Doctor of Dental Medicine degree from the University of Louisville. (Doc. No. 186, filed Jan. 28, 2005, Arthur Depo., pp. 8–9, 24–25). He further earned a specialty license in periodontics from the University of Florida and has been practicing in that area of specialization continuously since 1981. (*Id.* at 9–10).

On the advice of his stockbroker, Andrew Sullivan, and his accountant, Dave Corral, concerning estate planning and the protection of his assets, in 1994 Arthur began investigating the cost of obtaining life insurance in the amount of $1.5 million. (*Id.* at 27–28, 29, 32–33).

Arthur's attorney had set up an irrevocable trust which would be the beneficiary of the policy, and the policy's proceeds upon Arthur's death would be sufficient to cover the resulting tax liability. (*Id.* at 29–30). Arthur testified that he was specifically interested in a policy he could pay off before retirement age, "something that would be in the ten-year range." (*Id.* at 37). Arthur contacted Defendant's agent Carl Weaver and requested a proposal because the two men had dealt with each other for several years with regard to Arthur's health insurance policies. (*Id.* at 31).

In response to Arthur's telephonic inquiry, Weaver informed Arthur in person that he was eligible to obtain a flexible premium adjustable life policy from Defendant.[2] (*Id.* at 33, 36; Doc. No. 178, Ex. C). Weaver allegedly represented that such a policy would require only ten annual payments of $22,528.48 each, and that after ten payments, the policy would be "paid up" and would not require additional premiums. (Doc. No. 178, Ex. C). Arthur testified that "the proposal was for 10 years you pay this amount, you get this much insurance. And I specifically wanted to know a fixed rate, because of the retirement activity, or potential of retirement activity." (Doc. No. 186, Arthur Depo., p. 45). Weaver also gave Arthur the option of paying $10,000 extra with the first annual payment and reducing the number of required annual payments from ten to nine, which option Arthur elected. (*Id.* at 43). After passing a rigorous physical examination required by Defendant, Arthur purchased and received his policy dated May 15, 1994. (*Id.* at 37–38, 41; Doc. No. 178, Ex. D, p. 3).

---

[2] In addition to Weaver's quote for Defendant's product, Arthur considered a proposal provided by his stockbroker, Sullivan, for a similar policy written by a different insurance company. (*Id.* at 32). Arthur testified that he preferred Defendant's policy because it cost less money and "achieved the same goal with the same insurance." (*Id.* at 32–33).

Arthur testified that the information he learned about the policy came from written materials provided by Weaver as well as Weaver's oral representations. (Doc. No. 186, Arthur Depo., p. 41). Arthur and Weaver met in person two or three times and had a number of telephone conversations to discuss the policy. (*Id.* at 43). Weaver allegedly represented that the proposal was based on a fixed rate, and upon Arthur's request, Weaver made a handwritten notation on the first page of Arthur's March 23, 2004, policy application indicating annual premium payments of "$22,528.48 *to pay up in ten years*." (*Id.* at 45–46; Doc. No. 178, Ex. C (emphasis added)). Arthur testified that he interpreted such notation to mean that those terms were guaranteed, and he further stated that he would not have purchased the policy without Weaver's oral and handwritten confirmation of this guarantee. (Doc. No. 186, Arthur Depo., pp. 45–46, 84–85).

In 2002, Arthur alleges that he was notified by Defendant that its investments had lost money and that he would be required to make additional premium payments in order to maintain his policy. (*Id.* at 50–51). According to Arthur, the company informed him that it would no longer "subsidize" his policy and the monthly cost of insurance would double from $600 to $1,200 per month,[3] the effect of which was that the interest earned on the policy no longer would be sufficient to carry the policy on its own. (*Id.* at 66–67). Upon learning this, Arthur attempted to cancel his insurance policy. (*Id.* at 51). However, he testified that Defendant's representatives repeatedly sent him cancellation paperwork which was identical to forms he had

---

[3] According to the annual Policyholder Statements mailed to Arthur by Defendant, the monthly cost of insurance appears to have gradually declined from approximately $600 in 1994 to just below $400 in 2002 before increasing again to approximately $500 in 2003. (Doc. No. 178, Ex. F). The monthly cost then jumped from $508.05 in October 2003 to $1,254.56 in November. (*Id.*).

already completed numerous times, and after four or five telephone conversations in which Defendant's employees allegedly became "nasty" when asked why he had not received a check for the surrender value, Arthur ceased trying to cancel his policy. (*Id.* at pp. 51–52, 54). Arthur stated that at the time he purchased his life insurance policy, he understood that he was entitled only to a guaranteed minimum interest rate on the policy but believed that "the premiums could never increase or decrease on [his] policy."[4] (*Id.* at 68–70).

Arthur testified that he read his policy when he received it and that he understood it to indicate that he would "build up equity within the policy to carry the policy." (Doc. No. 186, Arthur Depo., pp. 47, 79). The cover page of Arthur's May 15, 1994, policy includes the statements "READ YOUR POLICY CAREFULLY," "NOTICE OF 20 DAY RIGHT TO EXAMINE [and cancel] THE POLICY" and "FLEXIBLE PREMIUMS PAYABLE DURING THE LIFETIME OF THE INSURED UNTIL THE MATURITY DATE." (Doc. No. 178, Ex. D, p. 1). Arthur testified that "[t]he term flexible was not used a great deal when I was buying this....it was not an emphasis type thing. It was a fixed amount." (Doc. No. 186, Arthur Depo., p. 78).

The Policy Data page lists a "Planned Periodic Premium" of $22,528.48 and notes the "Premium Frequency" as "Annual." (Doc. No. 178, Ex. D, p. 3). During his deposition, Arthur admitted that he must have seen this provision when he reviewed the policy. (Doc. No. 186, Arthur Depo., p. 80). When asked to acknowledge that the policy contained no language

---

[4] Arthur does not allege that Defendant failed to pay the policy according to its minimum guaranteed rate provision. Instead, he bases his claims on the increase in monthly insurance costs which Defendant allegedly attributed to underperforming investments and which the minimum guaranteed interest rate was then insufficient to cover. (*Id.* at 68).

indicating that only ten years' worth of premiums would be required, Arthur acquiesced but added, "that's why I asked [Weaver] to put the statement on the front of the [application] ... because I was uncomfortable with it at the time." (*Id.*).

In the "General Provisions" section, under the heading "Entire Contract," the policy states,

> This policy, including any attached riders, and the attached copy of the application and any supplemental applications for additional coverage are the entire contract. This policy cannot be changed or any of its provisions waived, including any extension of time to pay premiums, except by the President, Vice President, Secretary or Assistant Secretary.
>
> All statements made in an application are assumed, in the absence of fraud, to be representations and not warranties. No statement will be used to void this policy or defend against a claim unless it is contained in the application or a supplemental application.
>
> Any changes, modifications, or waivers must be in writing. No agent has authority to waive a complete answer to any question on the application, pass on insurability, make or alter any contract or waive any of the Company's other rights or requirements.

(Doc. No. 178, Ex. D, p. 14). Arthur testified that he would have seen this section of the contract had he read the policy in detail at the time he received it; however, he stated that "when you are buying a policy like this from an agent that you know, you trust, you think he's reputable, he works in the state insurance commissioner's office...you go by what they tell you a lot of times." (Doc. No. 186, Arthur Depo., pp. 81–82).

Arthur also received from Defendant a "Statement of Policy Cost and Benefit Information" ("Policy Statement") dated May 15, 1994. (*Id.* at 93; Doc. No. 178, Ex. E). Under the heading "Basic Policy," this document states that "flexible premiums payable during the lifetime of the insured until age 100," and under "Important Notice," the Policy Statement declares "the projected results of your insurance program may change drastically with variations

in the interest rates, mortality rates (risk charges), expense factors, and the frequency, timing, and amount of your premium payments. You should read and study your policy and policy summary very carefully." (Doc. No. 178, Ex. E). In addition, the Policy Statement contains a table setting forth both guaranteed and projected figures concerning the accumulation, cash surrender value, and death benefit for the first twenty years of the policy. (*Id.*). This illustration reflects an annualized premium of $22,528.48 being paid every year, not only during the first ten years of the life of the policy. (*Id.*). Once again, Arthur testified that had he read the document at the time it was provided to him by Defendant, he would have seen these provisions. He acknowledged that the Policy Statement contains no indication that premiums would be payable for ten years only; however, he repeated that he trusted and depended on Weaver's representations that the policy would be paid up in ten years. (Doc. No. 186, Arthur Depo., pp. 94–95).

Arthur initiated this lawsuit in April 2004, almost ten years after he purchased Defendant's vanishing premium life insurance policy. (Case No. 6:04-cv-587, Doc. No. 1). Defendant now moves for summary judgment on statute of limitations and substantive grounds. (Doc. No. 176).

## Standard of Review

Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate only in circumstances where "the evidence is such

that a reasonable jury could [not] return a verdict for the nonmoving party." *Id.* The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether the moving party has satisfied the burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (citation omitted). If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then a court must not grant summary judgment. *Id.* (citation omitted).

## Analysis

Defendant argues that summary judgment is proper because Arthur's claims of fraudulent inducement and fraudulent concealment are time barred. In the alternative, Defendant contends that there is insufficient record evidence to support a finding that Arthur justifiably relied on Weaver's representations concerning the life insurance policy. It is undisputed by the parties that Florida law governs Arthur's claims. (Doc. No. 177, p. 10; Doc. No. 186, p. 4).

### *Statute of Limitations*

Florida law provides a four-year limitations period for fraud claims, which begins "running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence...." FLA. STAT. §§ 95.031(2)(a), 95.11(3)(j). Whether an individual, by the exercise of reasonable diligence, should have known

he had a cause of action against a defendant is ordinarily a question of fact to be left to a jury. *See Koehler v. Merrill Lynch & Co.*, 706 So. 2d 1370, 1373 (Fla. 2d DCA 1998) (citing *Puchner v. Bache Halsey Stuart, Inc.*, 553 So. 2d 216, 217 (Fla. 3d DCA 1989)); *Brugiere v. Credit Commerciale France*, 679 So. 2d 875, 877 (Fla. 1st DCA 1996) (citing *Rosen v. Sparber*, 369 So. 2d 960 (Fla. 3d DCA 1979); *Walker v. Dunne*, 368 So. 2d 640 (Fla. 2d DCA 1979); *Green v. Bartel*, 365 So. 2d 785 (Fla. 3d DCA 1978); *Schetter v. Jordan*, 294 So. 2d 130 (Fla. 4th DCA 1974)). That the applicability of the "delayed discovery" doctrine generally should be decided by the fact finder was reiterated by the Eleventh Circuit Court of Appeals in its reversal of this Court's summary judgment as to Plaintiff Siegel's level premium-based fraud claims against Defendant. (Doc. No. 118, p. 11). In that opinion, the Circuit Court found no evidence in the record to demonstrate "that Siegel understood or could have determined that [his] policy premiums might exceed $100 " and held that the question of whether those claims were time barred was for a jury to decide. (*Id.* at 16).

Defendant argues that the facts on which Arthur's claims rest are identical to those concerning Plaintiff Jones, on which facts the Eleventh Circuit affirmed this Court's dismissal of Jones' claims of fraudulent inducement and fraudulent concealment due to the expiration of the limitations period. Jones and Arthur both purchased Defendant's vanishing premium life insurance policies, and it is undisputed that the provisions of the two policies were materially similar. Defendant acknowledges that Jones' claims were governed by and evaluated pursuant to the laws of Texas, not Florida, but contends that the relevant laws are comparable, urging the Court to find the two plaintiffs similarly situated and to grant summary judgment in Arthur's case as it did in the case of Jones. (Doc. No. 177, pp. 12–15).

Defendant correctly states that Florida law imposes on an insured party the duty to read his insurance policy before he signs it. *See Reliance Ins. Co. v. D'Amico*, 528 So. 2d 533, 535 (Fla. 2d DCA 1988) (unless a plaintiff "was prevented from reading or induced not to read the policy before he signed it, he is bound by its terms."). This duty is similar to that required by Texas law, and it is the duty to which the Court of Appeals held Jones. (Doc. No. 118, pp. 22–23 ("Because Jones accepted the policy without dissent, he is presumed to know its contents.") (citing *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119 (Tex. 1976); quoting *inter alia Ruiz v. Gov't Employees Ins. Co.*, 4 S.W.3d 838, 841 (Tex. App. 1999) ( "An insured has a duty to read the policy and, failing to do so, is charged with knowledge of the policy terms and conditions.") (citations omitted)). However, as noted in the Eleventh Circuit's opinion, Jones previously had been a *licensed insurance agent* who sold life insurance exclusively, he did not read his policy when he received it, and he "concede[d] that, had he read the policy at that time, he would have *understood* the relevant terms and *immediately cancelled the policy*." (*Id.* at 21 & n. 10 (emphasis added)). Based on these facts and on Jones' own admission, the Court held that Jones had information in his possession at the time he received the policy which would have alerted him to his fraud claims for purposes of the statute of limitations, and affirmed this Court's summary judgment as to those claims. (*Id.* at 22).

In contrast, Arthur testified during his deposition that he did review his policy upon receipt and that had he read it in more detail, he would have *seen* the various provisions to which Defendant points as indicators to the reader that there was no guarantee that premiums would vanish after ten years. (Doc. No. 186, Arthur Depo., pp. 80–82, 94–95). Despite Defendant's attempt to characterize his testimony as such, Arthur did not testify as Jones did that he would

have *understood* these provisions to expressly contradict the representations made to him by his agent or that he would have cancelled his policy.  Instead, Arthur testified that when he read his policy, his understanding "to the best of [his] knowledge" continued to be that he would "build up equity within the policy to carry the policy."  (*Id.* at 47).

Arthur further testified that he continued to rely on the handwritten notation made by Weaver on the policy application stating that the policy would be paid up in ten years, such confirmation having been made at Arthur's request because he had been "uncomfortable" with the potential number of required payments.  (*Id.* at 80).  Defendant argues that Arthur's testimony concerning his discomfort supports its argument that it was unreasonable for Arthur not to examine his policy more closely in order to confirm the number of payments required.  (Doc. No. 177, p. 14).  However, the Florida Supreme Court has held that "a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him."  *Besett v. Basnett*, 389 So. 2d 995, 998 (Fla. 1980).

Arthur's experience appears to have been less similar to Jones' than to Siegel's, as recited in this Court's previous Orders, inasmuch as Siegel testified that he read only a portion of his policy when he received it and it appeared to confirm the representations made to him by his agent concerning the amount of the premiums he would be required to pay.  (Doc. No. 111, p. 5–6; Doc. No. 139, p. 7).  Like Arthur's vanishing premium policy, Siegel's level premium policy warned the policyholder to read the contract carefully, provided a twenty-day review and cancellation period, and stated that flexible premiums would be payable during the lifetime of the insured until the maturity date.  (*Id.* at 6).  In addition, the absence in Siegel's policy of a

guarantee that his annual premiums would always be $100 is comparable to the absence of a guarantee in Arthur's policy that his premiums would vanish after ten years.  Nevertheless, the Eleventh Circuit held that whether Siegel knew or should have known that the representations made to him by his agent were false was a question for the jury's determination.  (Doc. No. 118, p. 16).  Similarly, while Arthur is well-educated, he is not a former life insurance agent as Jones was, and whether Arthur should have known of the falsity of Weaver's representations upon reading his policy in 1994, as Defendant contends, or could not have known of their falsity until notified in 2002 that additional premiums would be required, as Arthur argues, is a question of fact which should be decided by a jury.  Accordingly, the Court will deny Defendant's motion for summary judgment on the basis of the statute of limitations.

*Merits of Arthur's Fraud Claims*

Under Florida law, a plaintiff stating a cause of action for fraudulent inducement must prove: (1) a misrepresentation of a material fact; (2) that the person making the misrepresentation knew or should have known of the statement's falsity; (3) the intent by the person making the misrepresentation that the statement would induce another to rely and act upon it; and (4) that the plaintiff suffered injury in justifiable reliance on the misrepresentation. *See Hillcrest Pacific Corp. v. Yamamura*, 727 So. 2d 1053, 1055 (Fla. 4th DCA 1999).  The elements of fraudulent concealment are essentially identical to those of fraudulent inducement except that fraudulent concealment additionally requires the claimant to establish that the person making the misrepresentation actively worked to prevent the other party from discovering the truth or that the relying party did not have an equal opportunity to become apprised of relevant information concerning the representation.  *See Mettler v. Ellen Tracy, Inc.*, 648 So.2d 253, 255

(Fla. 2d DCA 1994) (citing *Ramel v. Chasebrook Constr. Co.*, 135 So. 2d 876, 882 (Fla. 2d DCA 1961)).

Defendant's motion for summary judgment with regard to the substance of Arthur's claims of fraud is based solely on its argument that, in light of written policy provisions to the contrary, Arthur was not justified in his reliance on Weaver's representations that the annual premium required to maintain his life insurance policy would vanish after ten years. (Doc. No. 177, pp. 15–17).

Courts have treated the inquiry into whether a plaintiff was reasonable in his reliance on a fraudulent misrepresentation as relevant to determining the commencement of the statute of limitations, as discussed *supra*, as well as to proving the fourth substantive element of the cause of action based on fraud, and these courts have held that such issue often presents questions of material fact which should be submitted to a jury. *See, e.g.*, *Koehler*, 706 So. 2d at 1373; *Brugiere*, 679 So. 2d at 878. Florida courts have held that a plaintiff may not recover in fraud for alleged oral misrepresentations when they are expressly contradicted and proper disclosure of the truth is adequately covered in a later written contract. *See, e.g.*, *Taylor Woodrow Homes Florida, Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 543 (Fla. 5th DCA 2003) (defendant's failure to disclose interest in plaintiff's competitor did not constitute fraud where such interest was later expressly disclosed in early drafts of contract and final loan agreement between parties); *Hillcrest Pacific*, 727 So. 2d at 1056 (no fraudulent inducement where alleged misrepresentation of price of property was contradicted by clear statement of actual price in purchase agreement); *Englezios v. Batmasian*, 593 So. 2d 1077, 1078 (Fla. 4th DCA 1992) (plaintiff tenant could not maintain claim of fraudulent inducement against landlord based on alleged misrepresentation of

premises' suitability for use as sit-down restaurant where lease between parties put onus on tenant to secure city approval for restaurant or cancel lease within a time certain).

Defendant strenuously contends that the standard language of Arthur's policy contradicts Weaver's oral representations concerning vanishing premiums. (Doc. No. 177, p. 16). In addition, Defendant focuses on the language which states that no changes may be made to the policy "except by the President, Vice President, Secretary or Assistant Secretary," and that "[n]o agent has authority to...make or alter any contract or waive any of the Company's other rights or requirements." (Doc. No. 178, Ex. D, p. 14). It argues that this language nullifies the Weaver's handwritten assurance of a ten-year payoff. (Doc. No. 177, p. 16).

Defendant glosses over that portion of the policy which provides that *the application is a part of the entire contract* between the parties. (Doc. No. 178, Ex. D, p. 14). According to Arthur's testimony, Weaver's confirmation that Arthur's policy would be "paid up" in ten years was written on the application dated March 23, 1994, before that document was submitted to Defendant. (Doc. No. 186, Arthur Depo., pp. 45–46; Doc. No. 178, Ex. C). It appears from the record that Defendant subsequently approved Arthur's application as submitted and issued a life insurance policy to Arthur on May 15, 1994. (Doc. No. 178, Ex. D). Upon Arthur's request and to address his specific requirement that whatever policy he purchased would be fully paid after ten years, Weaver reduced the oral representations on which Arthur allegedly relied to writing on a document which was then incorporated into the final agreement between the parties. Thus, the facts of the instant case are distinguishable from those cases cited *supra* in which alleged misrepresentations were flatly contradicted by the terms of subsequent written contracts. *See Taylor Woodrow Homes*, 850 So. 2d at 543; *Hillcrest Pacific*, 727 So. 2d at 1056; *Englezios*, 593

So. 2d at 1078; *cf. Emmco Ins. Co. v. Marshall Flying Serv., Inc.*, 325 So. 2d 453, 454 (Fla. 2d DCA 1976) (affirming trial court's entry of summary judgment in favor of insured where application contained specific request for chemical damage coverage even though such coverage was expressly excluded by policy terms, reasoning that proper application for the coverage had been made, the agent knew or should have known of such request, and the agent failed to notify insured that the policy issued excluded the coverage).

Based on this evidence, it is possible in the instant case for a reasonable jury to find that Weaver's handwritten notation became a part of the entire contract just as Arthur's answers to Defendant's questions on the application undisputedly became a part of the policy according to the terms of the "General Provisions" section of the contract.[5]  (Doc. No. 178, Ex. D, p. 14). Even if the notation did not actually become a term of the policy according to contract law principles, a reasonable jury could decide that Arthur was nevertheless justified in believing that it had become a part of the contract.  Because such findings are possible, the terms of the policy at issue do not flatly contradict Weaver's alleged misrepresentations upon which Arthur relied in purchasing his life insurance policy, and the Court finds that there is a genuine issue of material fact concerning Arthur's justifiable reliance on those representations.  Accordingly, the Court will deny Defendant's motion for summary judgment.

---

[5] Such a finding would not adversely affect Arthur's fraud-based claims.  Although the "economic loss rule" generally bars a plaintiff's recovery of economic damages in tort where the underlying actions are governed by a contract negotiated by the parties, the Supreme Court of Florida has held that intentional torts which are "committed independently of [a] contract breach, such as fraud in the inducement," are exceptions to the rule.  *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 537, 543 n.3 (Fla. 2004) ("Intentional tort claims such as fraud...requiring proof of intent generally remain viable...if the parties are in privity of contract. ...[A] rule barring recovery for economic loss 'is not an escape hatch from intentional commercial torts.'") (citation omitted).

**Conclusion**

Based on the foregoing, Defendant's Motion for Summary Judgment Against Plaintiff Harold Arthur (Doc. No. 176) is **DENIED**. In accordance with the Court's Order granting the parties' Joint Motion for Continuance of Trial Setting (Doc. No. 210, filed May 10, 2005), this case is hereby placed on the September 6, 2005, trial calendar before the undersigned. A separate notice of the date and time of the final pretrial conference will be issued by the United States Magistrate Judge.

**DONE** and **ORDERED** in Chambers in Orlando, Florida this _2nd_ day of June, 2005.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:
Counsel of Record